FILED
United States Court of Appeals
Tenth Circuit

April 26, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellant/Cross-Appellee,

v.

DANIEL EUGENE COOKSON,

     Defendant-Appellee/Cross-Appellant.

Nos. 18-3070
and 18-3071

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:17-CR-10087-JTM-1)**
_____

Stephen R. McAllister, United States Attorney (Jason W. Hart, Assistant United States Attorney, with him on the briefs), District of Kansas, Wichita, Kansas, for Plaintiff-Appellant/Cross-Appellee.

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Federal Public Defender, Timothy J. Henry, Assistant Federal Public Defender, with him on the briefs), Kansas City, Kansas, for Defendant-Appellee/Cross-Appellant.
_____

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Daniel Eugene Cookson pleaded guilty to two counts of possessing child pornography after the FBI identified him in the course of its large-scale sting operation involving the website "Playpen." At his sentencing hearing, the district court determined Mr. Cookson's criminal history and total offense level correlated to a Guidelines range of 97–121 months. The district court announced its intention to sentence Mr. Cookson to a term of seventy-two months' imprisonment. But after entertaining argument from both parties and inviting Mr. Cookson's allocution, the district court imposed a sentence of five years' probation.

The United States appealed, challenging Mr. Cookson's sentence as substantively unreasonable. Mr. Cookson cross-appealed, arguing the district court erred in refusing to suppress evidence obtained from his computer by the FBI pursuant to a warrant issued in the Eastern District of Virginia

We affirm the district court's suppression ruling based on our decision involving the same warrant in *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017), but we vacate Mr. Cookson's sentence as unreasonable and remand to the district court for resentencing.

## I.  BACKGROUND

### A.  *Search and Seizure*

In 2015, the FBI tracked down and arrested the operator of Playpen, a website that facilitated the distribution of child pornography. Instead of discontinuing Playpen's operations, however, the FBI decided to use the site to locate individuals using it to access child pornography. *Workman*, 863 F.3d at1315.

Finding Playpen's users presented a challenge because Playpen was accessible only through "Tor" (short for "The Onion Router"), a network and software program designed to allow users to browse the internet anonymously. *Id.* at 1315. To access Playpen, users "had to employ [Tor] software that routed . . . connections through [a series of] third-party computers called 'nodes.'" *Id.* By routing connections in this manner, Tor enabled its users to access Playpen without disclosing their IP addresses (unique numbers assigned to a given user's computer, *see United States v. Henderson*, 595 F.3d 1198, 1200 n.1 (10th Cir. 2010)) or other identifying information.

To bypass the steps Playpen took to keep its users anonymous, the FBI, after seizing control of the website, loaded Playpen's contents—pornography and all—onto a government server in the Eastern District of Virginia. *Workman*, 863 F.3d at 1315. The FBI then sought a warrant in the Eastern District of Virginia which would authorize it to deploy a network investigative technique ("NIT") on the government server hosting Playpen. In support of their application for a search warrant, the FBI obtained an affidavit from Agent Douglas Macfarlane explaining the operation of the proposed NIT as follows:

> In the normal course of operation, websites send content to visitors. A user's computer downloads that content and uses it to display web pages on the user's computer. Under the NIT authorized by this warrant, the TARGET WEBSITE [Playpen], which will be located in Newington, Virginia, in the Eastern District of Virginia, would augment that content with additional computer instructions. When a user's computer successfully downloads those instructions from [Playpen] . . . the instructions, which comprise the NIT, are designed to cause the user's . . . computer to transmit certain information [including IP addresses] to a computer controlled by or known to the government. . . . The NIT will not deny the user . . . access to any data or the functionality of the user's computer.

App. at 342–43. Essentially, when someone logged in to Playpen by entering a username and password, the NIT would cause that person's computer to transmit identifying information (including the user's IP address) to the FBI. A magistrate judge in the Eastern District of Virginia signed the warrant, and the FBI operated Playpen with the NIT for approximately two weeks.[1]

On February 22, 2015, someone with the username "shishkabobs" logged into Playpen. Shishkabobs's computer downloaded the NIT, causing it to transmit identifying information to the FBI. Using this identifying information, the government sought an administrative subpoena for the Southern Kansas Telephone Company to identify the physical address associated with the IP address obtained from shiskabobs's computer. Based on information received from the Southern Kansas Telephone Company, the FBI connected shiskabobs's IP address to a home Mr. Cookson shared with his parents and brother in Howard, Kansas. The FBI obtained and executed a search warrant for this home, where they found child pornography on various devices owned by Mr. Cookson. Mr. Cookson later confessed to using Playpen to view child pornography.

The government charged Mr. Cookson with two counts of possessing child pornography under 18 U.S.C. § 2252A(a)(5)(B). Mr. Cookson moved to suppress all evidence derived from the operation of the NIT on his computer, arguing the magistrate

---

[1] The Playpen NIT resulted in criminal charges throughout the country, meaning many courts, including ours, have reviewed the same NIT warrant for Fourth Amendment violations. *See, e.g.*, *Workman*, 863 F.3d at 1315; *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017); *United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017).

judge in the Eastern District of Virginia lacked authority to issue the NIT warrant and the warrant therefore violated the Fourth Amendment. Specifically, Mr. Cookson argued that magistrate judges generally may not issue warrants for the search of persons or property outside of their district. *See* 28 U.S.C. § 636(a) (provision of the Federal Magistrates Act giving magistrate judges authority "within the district in which [they sit]"). Although he recognized that the version of Fed. R. Crim. P. 41(b) in force at the time created a limited set of exceptions to this general rule, including for warrants concerning the installation of a tracking device, Mr. Cookson contended the exceptions did not include the NIT. He further argued that, if the district court deemed the warrant invalid, the good-faith exception could not save the fruits of the FBI's unconstitutional search from application of the exclusionary rule because (1) the FBI misled the magistrate judge in its warrant application, (2) the magistrate abandoned her judicial role, and (3) the FBI knew the warrant was facially deficient. *See Workman*, 863 F.3d at 1317–18 (setting forth circumstances in which the good-faith exception does not apply).

The district court denied the suppression motion. The court observed that the same NIT warrant in Mr. Cookson's case had been considered by many other trial courts across the country. Most of these courts found the magistrate judge who issued the NIT warrant lacked the authority to do so, yet they declined to suppress evidence obtained as a result of the NIT under the good-faith exception. *See, e.g.*, *United States v. Ammons*, 207 F. Supp. 3d 732 (W.D. Ky. 2016); *United States v. Henderson*, No. 15–CR–00565–WHO–1, 2016 WL 4549108 (N.D. Cal. Sept. 1, 2016); *United States v. Michaud*, No. 3:15–CR–05351–RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016). And while two courts

decided the good-faith exception did not apply and suppressed the evidence, these decisions were later reversed by the courts' respective circuits. *See United States v. Levin*, 874 F.3d 316, 325 (1st Cir. 2017); *United States v. Horton*, 863 F.3d 1041, 1052 (8th Cir. 2017). The Tenth Circuit addressed the NIT warrant in *United States v. Workman*, holding that, even assuming the warrant was invalid, the good-faith exception saved the evidence from suppression. 863 F.3d at 1319–21.

Here, the district court agreed that the Eastern District of Virginia magistrate judge exceeded her authority in issuing the NIT warrant but determined *Workman* governed the outcome of Mr. Cookson's case. Accordingly, the court applied the good-faith exception and denied Mr. Cookson's suppression motion.

### B. *Sentencing*

After the district court denied his motion to suppress, Mr. Cookson entered into a plea agreement as to both counts of the indictment. As relevant here, the plea agreement set forth Mr. Cookson's understanding that his plea entailed a maximum sentence of twenty years' imprisonment, various fines and assessments, and a minimum of five years' supervised release. Mr. Cookson and the government also agreed to a conditional plea allowing Mr. Cookson to appeal the district court's suppression decision. The government agreed that Mr. Cookson could remain on bond (under conditions of supervision) pending resolution of his appeal.

Prior to sentencing, Mr. Cookson's probation officer prepared a Presentence Investigation Report ("PSR"). The PSR calculated Mr. Cookson's base offense level as 18. This base offense level increased to 28 due to a number of adjustments pursuant to

U.S.S.G. § 2G2.2, including a two-level increase under U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor; a four-level increase under U.S.S.G. § 2G2.2(b)(4) because the material involved sadistic or masochistic conduct or other depictions of violence; a two-level increase under U.S.S.G. § 2G2.2(b)(6) because the offense involved the use of a computer, and a five-level increase under U.S.S.G. § 2G2.2(b)(7)(D) because Mr. Cookson possessed more than 600 images of child pornography. The PSR also listed Mr. Cookson's adult criminal convictions, which resulted in a criminal history score of six and placed him in a criminal history category of III.

Based on an offense level of 28 and a criminal history category of III, the PSR calculated a Guidelines range for Mr. Cookson of 97–121 months' imprisonment. Mr. Cookson's convictions entail a maximum term of imprisonment of twenty years, and a minimum term of five years' supervised release.

The parties filed sentencing memoranda. The United States requested a sentence of ninety-seven months' imprisonment followed by five years' supervised release, emphasizing Mr. Cookson's criminal history and the need to avoid unwarranted sentencing disparities between similarly situated defendants. The government stated that the average sentence for offenders within the 97–121 range was seventy months. The government also stated that the 18 U.S.C. § 3553(a) factors supported a within-Guidelines sentence based on Mr. Cookson's (1) use of Tor anonymizing software; (2) continued involvement with child pornography after being caught by his family; (3) involvement in social networks associated with child exploitation; (4) lengthy

involvement with child pornography; (5) sexting with strangers; and (6) involvement with illegal drugs. App. at 171.

Mr. Cookson requested a sentence of five years' probation, focusing on his rehabilitation as shown by holding a job for twenty-one months, being promoted, and recovering from drug addiction. Mr. Cookson also highlighted a policy disagreement with the § 2G2.2 sentencing enhancements, noting they apply in the majority of cases and have been criticized by the U.S. Sentencing Commission and various courts. Mr. Cookson explained that without those enhancements, his Guidelines range would be 24–30 months instead of 97–121.

During the sentencing hearing, the court determined the Guidelines range of 97–121 months had been correctly calculated based on a total offense level of 28 and criminal history category of III. Before hearing from the parties, the court stated the following:

> Having considered these factors and the advisory guidelines, the nature and circumstances of the offense, and Mr. Cookson's history and characteristics, I am of the view that the guidelines range, even the low end of the guideline range, is greater than necessary to serve the purposes of sentencing and it is my intention to sentence Mr. Cookson to a term of confinement of 72 months on each of Counts 1 and 2, those terms to run concurrently and not consecutively; to be followed by five years of supervised release on each of the two counts, those counts to run, again, concurrently and not consecutively.
>
> I believe that sentence is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offenses, all as set out at 18 U.S.C. Section 3553(a)(2)(A).

App. at 257–58. The court then invited the government to state its position on this tentatively-announced sentence. The government agreed with the sentence of seventy-two

8

months' imprisonment but reminded the court that Mr. Cookson had used "sophisticated anonymizing technology" (i.e., Tor) and had engaged with an "internet community devoted to child exploitation," which distinguished him from the "mine run" of defendants. App. at 260–62.

The court then heard argument from Mr. Cookson. Defense counsel began by disputing the government's characterization of aggravating factors under § 3553(a), arguing the use of Tor did not indicate a level of technical sophistication because the software is widely available and used for legitimate purposes, and that the government was incorrect in asserting Mr. Cookson had engaged in "production conduct." Defense counsel pointed to letters from Mr. Cookson's family and his employer, as well as the fact Mr. Cookson had overcome a drug addiction, as evidence of "extraordinary rehabilitation." App. at 274. Defense counsel also highlighted the overrepresentation of Mr. Cookson's criminal history—four out of six total points for that history coming from a single misdemeanor marijuana and drug paraphernalia possession charge. Defense counsel noted that Mr. Cookson held a good job, stayed clean, attended counseling, and had made "great strides in his life," to the point where he could continue to "live a drug-free and . . . law abiding lifestyle." App. at 276–77. Defense counsel argued imprisonment would "have [Mr. Cookson] go backwards rather than forwards," and a sentence of probation would allow Mr. Cookson to continue "contributing to society" and personally moving "in a positive direction." App. at 277. Mr. Cookson then allocuted, apologizing for his actions taken "in the midst of drug addiction [and] depression" and stating that he wished to keep his job and "continue working hard on [his] sobriety." Mr.

Cookson asked for a sentence of probation to allow him to "stay on [his] current path of living a healthy, normal life."

After hearing argument from defense counsel and Mr. Cookson's allocution, but before announcing a final sentence, the court stated the following:

> Mr. Cookson, it's pretty obvious that you have made some significant progress in terms of your drug addiction. I have no idea, obviously, where you are in terms of child pornography but I'm not aware of any further activity that came up during the course of the presentence investigation with respect to that.
>
> You do have a good job and the fact that you've been at it for two years speaks volumes. Your family is obviously very supportive and they have seen very positive changes in you over a period of time. It does seem that your criminal history is overrepresented given the fact that four of your six points came out of a misdemeanor marijuana possession charge even with all of the subsequent stuff. And, frankly, these are serious offenses . . . .

App. at 279–280. The court observed that Congress and the Sentencing Commission had "struggled with this area" (presumably, sentencing for child-pornography possession) and they were "hard" and "heartbreaking" cases. And the court recognized that becoming a registered sex offender represented a "very heavy burden." With respect to Mr. Cookson specifically, the court stated:

> I've seen a lot of people through here over the years convicted of these types of offenses. Some are people who literally are social recluses, who are up in their mother's attic or something, that's where they spend their time, they have no social life at all, any employment that they have they just go to work and they go home and there's no life even there, and you seem to be the exception to the norm. And I intend to give you credit for the fact that you did go out, you did get a job, [and] the fact that you're doing well with it . . . .

App. at 282.

The court then sentenced Mr. Cookson to five years' probation, noting it "would have been more inclined not to place [Mr. Cookson] on probation," but it was concerned

10

about imprisoning Mr. Cookson while his appeal was pending because his convictions could be overturned. App. at 283. The government objected to the sentence on procedural and substantive grounds, specifically noting its "procedural objection" to the court's apparent reliance on a concern about imprisoning Mr. Cookson pending resolution of his appeal, because the government had agreed Mr. Cookson could remain on bond for that period.

The court later produced a written "statement of reasons" for its sentence, checking boxes for the following reasons for a variance under 18 U.S.C. § 3553(a): "the history and characteristics of the defendant" (including the fact that his criminal history had been "over-represented"); "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" "to provide the defendant with needed educational or vocational training;" "to provide the defendant with other correctional treatment in the most effective manner;" and based on the district court's "policy disagreement with the guidelines," specifically § 2G2.2.

## II.   DISCUSSION

### A. *NIT Search*

At the outset, the parties do not dispute whether the NIT constituted a search within the meaning of the Fourth Amendment, whether the warrant was valid, or whether the search was reasonable despite the invalid warrant. The only issue before us is whether

11

the good-faith exception to the exclusionary rule applies to the government's search using the NIT. We decided it did in *Workman*.

There, we assumed the NIT search "violate[d] the Federal Magistrates Act [§ 636(a)] and the Federal Rules of Criminal Procedure." *Workman*, 863 F.3d at 1321. But we explained that under *United States v. Leon*, 468 U.S. 897 (1984), even "improperly obtained evidence remains admissible when the executing agents 'act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence.'" *Id.* at 1317 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)) (internal quotation marks omitted). Because we "expect agents executing warrants to be reasonably well-trained, but we do not expect them to understand legal nuances the way that an attorney would," we concluded in *Workman* that FBI agents could have reasonably relied on the warrant issued by the magistrate in the Eastern District of Virginia when executing the NIT search. *Id.* at 1320–21 (internal quotation marks omitted). Had the agents possessed "sophisticated legal training, they might have recognized" the problems posed by Rule 41(b) and 28 U.S.C. § 636(a), but we do not hold law enforcement to such a standard. *Id.* at 1320. We also observed that eight federal judges had held the NIT warrant complied with federal law and federal rules, suggesting the agents could reasonably "have made the same mistake" when acting in reliance on the warrant. *Id.* at 1321 (noting "objective reasonableness sometimes turns on the clarity of existing law"); *see United State v. Gonzales*, 399 F.3d 1225, 1228–29 (10th Cir. 2005) ("[O]fficers are generally not required to second-guess the magistrate's decision in granting a warrant.").

12

Although Mr. Cookson recognizes *Workman* involved the same warrant at issue in this case, he argues the record before us contains four new facts that alter the good-faith calculus under *Leon*. We evaluate each of these four facts not expressly considered by *Workman* in turn.

First, Mr. Cookson points to an internal guidance document produced by the Department of Justice—Computer Crime & Intellectual Prop. Section, Criminal Div., U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* (3d ed. 2009), http://www.justice.gov/criminal/cybercrime/docs/ssmanual2009.pdf. This manual advised law enforcement to ensure compliance with Fed. R. Crim. P. 41 by "obtain[ing] multiple warrants if they have reason to believe that a network search will retrieve data stored in multiple locations." *Id.* at 84. Mr. Cookson argues the manual advises law enforcement to "obtain additional warrants for each location where the data resides" to ensure compliance with Rule 41(b), 2nd Br. on Cross-Appeal at 26, and therefore it suggests that FBI agents (who "worked very closely with the Department of Justice" during the NIT operation, App. at 568) knew the NIT warrant would violate Rule 41(b). A fuller reading of the manual, however, reveals the DOJ bifurcated its advice depending on whether agents would be able to learn, prior to searching, whether the data searched was located within or without the district. Computer Crime & Intellectual Prop. Section, *supra*, at 84 ("Agents may in some cases be able to learn where the data is located before the search, but in others they will be unable to know the storage site of the data until after the search is completed."). When "agents can learn prior to the search that some or all of

13

the data described by the warrant is stored in a different location than where the agents will execute the search," the manual advises agents to obtain multiple warrants. *Id.* at 84–85. "When agents do not and even cannot know that data searched from one district is actually located outside the district," the manual expressly advises agents that "evidence seized remotely from another district *ordinarily should not lead to suppression of the evidence obtained*." *Id.* at 85 (emphasis added). The manual goes on to explain that courts will likely *not suppress* the evidence as either (1) obtained in compliance with Rule 41; or (2) even if in violation of Rule 41, obtained in a good-faith manner. *See id.* at 85 (citing *United States v. Ramirez*, 112 F.3d 849, 852 (7th Cir. 1997); *United States v. Denman*, 100 F.3d 399, 402 (5th Cir. 1996); *United States v. Rodriguez*, 968 F.2d 130, 135–36 (2d Cir. 1992)). Because the Tor software used to access Playpen concealed users' IP addresses, agents could not know that data searched pursuant to the NIT warrant was located outside the Eastern District of Virginia. Accordingly, the manual, far from suggesting agents acted in bad faith when obtaining or relying on the NIT warrant, gives support for the FBI's conclusion that the warrant met constitutional muster.

Second, Mr. Cookson points to *In re Warrant*, 958 F. Supp. 2d 753 (S.D. Tex. 2013), in which a magistrate judge denied the FBI's request for a warrant authorizing it to "surreptitiously install data extraction software" on a computer whose location was unknown. *Id.* at 755. Once installed, the software would search the computer for information, activate the computer's built-in camera, and transmit extracted data back to the FBI within the Southern District of Texas. *Id.* The magistrate judge held the warrant application satisfied none of the Rule 41(b) criteria. *Id.* at 756.

14

The facts of *In re Warrant* bear substantial similarity to those before us. Nevertheless, *In re Warrant* is insufficient to show the FBI lacked good faith when relying on the NIT warrant because magistrate judges differed on the question at the time. *In re Warrant* itself mentions that "in 2007 a magistrate judge is known to have issued a warrant authorizing a similar investigative technique to track the source of e-mailed bomb threats against a Washington state high school." *Id.* at 756 n.2. Likewise, a separate NIT warrant appears to have been issued against a Tor-based child pornography website in 2012. *See United States v. Laurita*, No. 8:13CR107, 2016 WL 4179365, at *3 (D. Neb. Aug. 5, 2016) ("Pursuant to court authorization, a NIT was installed on Website A during the period of November 16, 2012, and December 2, 2012."). This disagreement among magistrate judges supports *Workman*'s conclusion that the FBI reasonably deferred to the issuing magistrate's judgment on a question of unsettled law. *See* 863 F.3d at 1321 ("[O]bjective reasonableness sometimes turns on the clarity of existing law.").

Third, Mr. Cookson points to a September 2013 letter from the acting Assistant Attorney General ("AAG") to the Chair of the Advisory Committee on Criminal Rules. Letter from Mythili Raman, Acting Attorney Gen., to Judge Reena Raggi, Chair, Advisory Committee on the Criminal Rules (Sept. 18, 2013). In this letter, the AAG proposes an amendment to Rule 41 that would allow a magistrate judge "in a district where activities related to a crime have occurred to issue a warrant—to be executed via remote access—for electronic storage media and electronically stored information located within or outside that district." App. at 397. This letter cites *In re Warrant*, observing:

15

> [E]ven when investigators can satisfy the Fourth Amendment's threshold for obtaining a warrant for [a] remote search . . . a magistrate judge may decline to issue the requested warrant. For example, in a fraud investigation, one magistrate judge recently ruled that an application for a warrant for a remote search did not satisfy the territorial jurisdiction requirements of Rule 41.

*Id.* at 398. Although this letter lends credence to Mr. Cookson's argument that the FBI was aware of *In re Warrant* and Rule 41(b)'s territorial restrictions, it does not suggest the AAG believed the magistrate judge's decision in *In re Warrant* was correct. Rather, the AAG sought an amendment to Rule 41(b) because the rule "does not directly address the special circumstances that arise when officers execute search warrants, via remote access, over modern communications networks such as the Internet." App. at 397. The AAG hoped to "clarify" the rule because "while the Fourth Amendment permits warrants to issue for remote access to electronic storage media or electronically stored information, Rule 41's language does not anticipate those types of warrants in all cases." *Id.* at 399. Accordingly, the AAG letter does not show the AAG (or, by extension, the FBI) *knew* Rule 41(b) in its then-current form did not authorize the NIT warrant.

Finally, Mr. Cookson notes that Rule 41 was amended in 2016 to allow a magistrate judge to "issue a warrant to use remote access to search electronic storage media . . . within or outside [her] district if . . . the district where the media or information is located has been concealed through technological means." Fed. R. Crim. P. 41(b)(6)(A). The parties do not dispute that this amendment, had it been adopted two years earlier, would have expressly authorized the NIT warrant. But we disagree with Mr. Cookson's contention that "there would have been no need to amend Rule 41" had the NIT search been authorized at the time. 2nd Br. on Cross-Appeal at 28. The amendment

16

fails to show the FBI's lack of good faith for the same reason the AAG letter does—the amendment of Rule 41 is consistent with an aim to *clarify*, but not necessarily *change*, the rule. Therefore, the proposed and actual amendment bear no clear indications that the pre-amendment Rule 41 forbade the NIT warrant, let alone that the FBI knew as much.

Taken together, Mr. Cookson's four new facts, at most, support *Workman*'s conclusion that the territorial restrictions of Rule 41(b) were unclear at the time the NIT warrant issued. *See* 863 F.3d at 1321. A review of decisions before and since confirms courts could and did differ on, for example, whether the NIT amounted to a "tracking device" expressly authorized by Rule 41. *Compare, e.g.*, *United States v. Jones*, 230 F. Supp. 3d 819, 824–25 (S.D. Ohio 2017), *with Ryan Anthony Adams*, 2016 WL 4212079, at *6 ("[T]he NIT does not track; it searches."). Accordingly, these new facts do not remove us from *Workman*'s ambit, and we decline Mr. Cookson's invitation to distinguish or overrule binding precedent.

## B. *Sentencing*

On appeal, the government challenges Mr. Cookson's five-year probationary sentence as substantively unreasonable and purports to waive any challenge as to the sentence's procedural reasonableness. Yet much of the government's argument focuses on the district court's explanation for Mr. Cookson's sentence—specifically its brevity, reliance on a misunderstanding of the terms of Mr. Cookson's plea agreement, failure to consider various § 3553(a) factors, and unexplained deviation from an initially-announced seventy-two-month period of imprisonment. We typically consider such arguments as pertaining to a sentence's procedural reasonableness. *United States v.*

17

*Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) ("Procedural reasonableness addresses whether the district court incorrectly calculated . . . the Guidelines sentence, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors, relied on clearly erroneous facts, or failed to adequately explain the sentence.") Indeed, the government itself framed some of these objections as "procedural" at Mr. Cookson's sentencing hearing.

Still, we have recently acknowledged a blurring of the line between procedural and substantive reasonableness when it comes to the district court's explanation for a given sentence. *See United States v. Barnes*, 890 F.3d 910, 917 (10th Cir. 2018). Therefore, after stating the standard for our review of the district court's sentencing decision, we review the distinction between procedural and substantive reasonableness and its impact on our decision before evaluating the substantive reasonableness of Mr. Cookson's sentence.

1. **Standard of Review**

We review a district court's sentencing decision for substantive reasonableness under an abuse-of-discretion standard, looking at the "totality of the circumstances." *United States v. Balbin-Mesa*, 643 F.3d 783, 787 (10th Cir. 2011). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009). Our abuse-of-discretion standard applies "without regard to whether the district court imposes a sentence within or outside the advisory guidelines range," so we do not apply a presumption of unreasonableness to sentences outside the guidelines range. *Id.*

Instead, we "give due deference to the district court's decision that the § 3553(a) factors, on [the] whole, justify the extent of the variance." *Id.* (quotation marks omitted). "That we might reasonably have concluded a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* (quotation marks and alterations omitted). We bear in mind that the "sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case," *Gall v. United States*, 552 U.S. 38, 51 (2007), because "[t]he judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *United States v. Barnes*, 890 F.3d 910, 915–16 (10th Cir. 2018) (quoting *Gall*, 552 U.S. at 51). Finally, "when we review a downward variance from the recommended guidelines range, as we do here, even more solicitude to the sentencing court is appropriate." *Id*. at 916.

## 2. Procedural Versus Substantive Unreasonableness

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), which converted the mandatory federal sentencing scheme into a discretionary one, we review sentences imposed by the district court for reasonableness. *Friedman*, 554 F.3d at 1307. Our reasonableness review has two aspects: procedural and substantive. *Id.* When reviewing a sentence for procedural reasonableness, we consider "whether the district court committed any error in calculating or explaining the sentence." *Id.*; *see also Gall*, 552 U.S. at 51 (stating appellate courts must first "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a)

19

factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . .”). When reviewing a sentence for substantive reasonableness, we focus on “whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).” *Friedman*, 554 F.3d at 1307 (quotation marks omitted).

This distinction turns murky, however, when we consider that the district court’s explanation for a given sentence serves a “dual purpose.” *See Barnes*, 890 F.3d at 917. First, a district court’s explanation of how the § 3553(a) factors apply “is a procedural requirement,” *id.*, and the “absence of explanation could constitute procedural error” as could the failure to address a defendant’s material, non-frivolous arguments under the § 3553(a) factors. *United States v. Lente*, 647 F.3d 1021, 1031, 1035 (10th Cir. 2011). Second, the content of the district court’s explanation “is relevant to whether the length of the sentence is substantively reasonable” because “[a] sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it.” *Barnes*, 980 F.3d at 917. Stated another way, we rely on the district court’s procedurally-required explanation in order to conduct “meaningful appellate review” of a sentence’s substantive reasonableness. *Gall*, 552 U.S. at 50; *see Lente*, 647 F.3d at 1039 (explaining that “[w]e cannot fulfill our appellate role, however deferential, in assessing the substantive reasonableness of [a] sentence” without an adequate explanation from the district court). A limited, brief, or inconsistent explanation hinders our ability to do so, and therefore “put[s] at risk the substantive reasonableness of any decision [the district court] reached.” *United States v. Lychock*, 578 F.3d 214, 220

20

(3d Cir. 2009) (quoting *United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007)); *see Friedman*, 554 F.3d at 1312 ("[T]he very limited nature of the record and the paucity of reasoning on the part of the district court most certainly bear on our review of the substantive reasonableness of Friedman's sentence."); *United States v. Gonzalez*, 529 F.3d 94, 98 (2d Cir. 2008) ("Determination of whether the sentence is unreasonable is hampered by the brevity of the reasons given for it."). This is especially true when the sentence varies greatly from the sentencing Guidelines, because "a major [variance] should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

But the heavier our reliance on the inadequacy of the district court's explanation in holding Mr. Cookson's sentence substantively unreasonable, the less our decision restricts the "bounds of reasonable choice" available to the district court in crafting a sentence on remand. *Barnes*, 890 F.3d at 917. A sentence deemed substantively unreasonable primarily because of an explanation too brief or cursory to justify the extent of its variance from the Guidelines might be substantively reasonable given a more detailed explanation. *See United States v. Park*, 758 F.3d 193, 202 (2d Cir. 2014) ("In holding that the District Court's probationary sentence was *substantively unreasonable*, we rely heavily upon the District Court's own evaluation of the case, as revealed by its statements at the sentencing hearing. . . . We thus do not foreclose the possibility that the imposition of a probationary sentence on remand, after appropriate consideration of the § 3553(a) factors thus far left unaddressed, could be *substantively reasonable* as well.").

With that backdrop in place, we consider Mr. Cookson's sentence in light of "all the circumstances of the case," *Friedman*, 554 F.3d at 1307, using the district court's explanation for the sentence "to assist us in determining whether the district court abused its discretion in weighing the § 3553(a) factors," *Barnes*, 890 F.3d at 917.

### 3. Substantive Reasonableness Review

18 U.S.C. § 3553(a) requires district courts to consider seven factors in sentencing: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for a sentence to reflect the "basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, and (d) rehabilitation," *United States v. Walker ("Walker I")*, 844 F.3d 1253, 1253 (10th Cir. 2017); (3) the kinds of sentences available; (4) the Sentencing Commission Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need for restitution. *See* 18 U.S.C. § 3553(a)(1)–(7).

The district court explained Mr. Cookson's sentence primarily in terms of § 3553(a)(1), specifically referencing Mr. Cookson's (1) recovery from drug addiction, (2) success in a new job, and (3) support from his family. The court acknowledged that Mr. Cookson's offenses were serious and that possession of child pornography causes significant harm to the children depicted. *See United States v. DeRusse*, 859 F.3d 1232, 1239 (10th Cir. 2017) ("Viewing the entire sentencing transcript in context . . . we are convinced that the district court was fully aware of the seriousness of the offense and took very seriously the harm suffered by the [victims].") But after hearing argument from

22

defense counsel about Mr. Cookson's three-year recovery from addiction and from Mr. Cookson himself attributing his conduct to "a bad place in [his] life at the time in the midst of drug addiction [and] depression," App. at 278, the district court remarked that Mr. Cookson's pre-sentencing rehabilitation made him the "exception to the norm," App. at 282. The district court observed that Mr. Cookson had obviously made "significant progress in terms of . . . drug addiction," App. at 279, and that Mr. Cookson had "a good job and the fact that [Mr. Cookson has] been at it for two years speaks volumes," *id.* at 280. Finally, the court noted, "It does seem that [Mr. Cookson's] criminal history is overrepresented given the fact that four of [his] six points came out of a misdemeanor marijuana possession charge."[2] App. at 280. The combination of these circumstances could reasonably support a downward variance, even a large one, under 18 U.S.C. § 3553(a)(1). *See Walker I*, 844 F.3d at 1257.

The district court's written statement of reasons also expressed its policy disagreement with U.S.S.G. § 2G2.2 as a reason for the downward variance. We have described arguments criticizing the § 2G2.2 enhancements as "quite forceful" and have "specifically cautioned district courts to carefully apply the child pornography distribution guideline and remain mindful that they possess broad discretion in fashioning sentences under § 2G2.2." *United States v. Wireman*, 849 F.3d 956, 962 (10th Cir. 2017) (internal quotation marks and alterations omitted); *see also United States v. Grigsby*, 749

---

[2] The court's written statement of reasons makes clear that it weighed this fact under § 3553(a)(1), although an over-represented criminal history could also support a downward departure under U.S.S.G. § 4A1.3(b)(1).)

F.3d 908, 911 (10th Cir. 2014) (referencing a "number of reported cases where district courts have rejected application of § 2G2.2 for want of an empirical basis"); *United States v. Dorvee*, 616 F.3d 174, 186–87 (2d Cir. 2010) (noting that the ubiquitous application of the § 2G2.2 enhancements resulted in "virtually no distinction between the sentences for defendants [who merely possessed child pornography] . . . and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain"). Accordingly, the district court did not abuse its discretion in determining that its policy disagreement with § 2G2.2 could support the imposition of a more lenient sentence. But the court did not elaborate on this policy disagreement during the sentencing hearing except to say that "Congress has struggled with this area" and "the Sentencing Commission has struggled with this area." App. at 280. Nor did the court address the extent to which the disagreement weighed in its final decision. Instead, the court's explanation focuses overwhelmingly on Mr. Cookson's presentencing rehabilitation and its desire not to see Mr. Cookson's progress "turned back." *Id.* at 283.

Although we recognize these concerns as valid, we have cautioned against excessive reliance on a single factor in sentencing. In *Walker I*, we held substantively unreasonable a time-served sentence for a serial bank robber who pleaded guilty to two bank robberies. *See* 844 F.3d 1255.[3] We reasoned the district court had focused "almost

---

[3] On remand, the district court resentenced Mr. Walker to ten years of probation, two years of home confinement, and 500 hours of community service. *United States v. Walker (Walker II)*, 918 F.3d 1134, 1137 (10th Cir. 2019). The government appealed again, arguing that the district court violated *Walker I*'s mandate by declining to sentence

exclusively on Mr. Walker's newfound sobriety" and had paid "inadequate attention" to a number of other statutory factors, including the "basic aims of punishment" and the need to avoid unwarranted sentencing disparities, in deciding to impose a time-served sentence. *Id.* 1258–59; *see* 18 U.S.C. § 3553(a)(1), (6). Although the district court in *Walker I* discussed, for example, the values of specific deterrence and rehabilitation, we criticized its failure to mention incapacitation and its offhand "dismiss[al] [of] the relevance of [general] deterrence." *See Walker I*, 844 F.3d at 1257–58. Of course, the district court need not afford equal weight to each § 3553(a) factor, *United States v. Sanchez-Leon*, 764 F.3d 1248, 1267 (10th Cir. 2014), and we will defer on substantive-reasonableness review "not only to a district court's factual findings but also to its determinations of the weight to be afforded to such findings." *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). Unlike the district court in *Walker I*, however, the court here made no mention of deterrence, rehabilitation, or incapacitation in explaining Mr. Cookson's sentence. Nor did it address the potential for "unwarranted sentencing disparities" raised by the government. Although we can extrapolate reasoning from the district court's relatively brief explanation—for example, the district court might have viewed any disparity resulting from Mr. Cookson's sentence as a "warranted" one, *see Lente*, 759 F.3d at 1169 (explaining that "[o]ur sentencing scheme seeks to eliminate not

---

Mr. Walker to a prison term. *Id.* at 1143. We disagreed because *Walker I*'s mandate "did not specifically limit the district court's discretion by requiring it to impose a sentence of imprisonment." *Id.* at 1154. We declined to express any view on whether the new sentence was substantively reasonable, "as the government waived its argument on that point by failing to adequately address the district court's analysis." *Id.*

25

all sentencing disparities, but only unwarranted disparities") (internal quotation marks omitted)—the explanation itself does little to assist us in understanding how it applied the § 3553(a) factors other than § 3553(a)(1) to Mr. Cookson's case, *see Barnes*, 890 F.3d at 917. Without any explanation from the district court on the weight it afforded the other § 3553(a) factors in granting Mr. Cookson such a large variance, we consider the sentence as substantively unreasonable. *See Smart*, 518 F.3d at 808; *see also Gall*, 552 U.S. at 50 ("[A] major [variance] should be supported by a more significant justification than a minor one.").

Comparing the district court's explanation of Mr. Cookson's sentence with other recent cases upholding the substantive reasonableness of large downward variances supports this conclusion. *Barnes*, for example, considered a large downward variance for former jail employees convicted of conspiracy to violate, and deprivation of, constitutional rights related to abuse they inflicted on the jail's inmates. *See* 890 F.3d at 914 (affirming a downward variance from a Guidelines range of 70–87 months' imprisonment to a twenty-four-month sentence followed by twenty-four months' supervised release for the first defendant and a twelve-month sentence followed by thirty-six months' supervised release for the second). In upholding the sentences as substantively reasonable, we credited the district court with a "careful" discussion, in which the court "walked through" and "properly addressed each of the § 3553(a) factors before approving a downward variance from the Guidelines range." *Id.* at 918. The *Barnes* district court expressly considered, for example, the defendants' personal characteristics, their risk of recidivism, the "specific and general deterrence" advanced by

their sentences, and the seriousness of their offenses. *Id.* at 918–19. Likewise, in *DeRusse*, we affirmed a downward departure and variance from a Guidelines range of 108–135 months to a sentence of time served followed by five years' supervised release in a kidnapping case. 859 F.3d at 1235–36. We distinguished the district court's explanation of DeRusse's sentence from that in *Walker I*, describing it as having "thoughtfully considered all of the § 3553 factors, rather than focusing almost exclusively on one particular factor, and concluded based on its assessment of all of these factors that a sentence of time-served would be the most appropriate." *Id.* at 1240.

Here, the district court's assessment, in addition to focusing almost exclusively on § 3553(a)(1), relied on an apparent misunderstanding of Mr. Cookson's conditional plea agreement. Fearing that Mr. Cookson's challenge to the suppression ruling might be successful, and that Mr. Cookson would then have spent time in prison and lost his job only for the charges against him to be dismissed, the court stated it would have been less inclined to place Mr. Cookson on probation but for his conditional plea. But the government had consented in the conditional plea agreement that Mr. Cookson could remain on bond pending resolution of his appeal. The district court's concern was thus unfounded, and its suggestion that it would have been more inclined to sentence Mr. Cookson to a term of imprisonment absent this concern gives us pause in deferring to its "decision that the § 3553(a) factors, on [the] whole, justify the extent of the variance." *Friedman*, 554 F.3d at 1307.

In light of this discrepancy, and because the district court placed nearly exclusive focus on Mr. Cookson's presentencing rehabilitation in explaining its decision, the

27

sentence it imposed is substantively unreasonable. We reach this conclusion, in large part, based on the significant variance in Mr. Cookson's sentence and the district court's limited and inconsistent explanation for that variance. *See Barnes*, 890 F.3d at 917 ("A sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it."). We therefore decline the government's request that we direct the district court to impose the seventy-two-month sentence it tentatively announced at the outset of Mr. Cookson's sentencing hearing. *See Koon v. United States*, 518 U.S. 81, 97 (1996) ("[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.") (quoting *Williams v. United States*, 503 U.S. 193, 205 (1992)). Nor do we agree the district court's deviation from its tentatively-announced seventy-two-month sentence should weigh heavily in our assessment of whether it reached a substantively unreasonable decision.[4] To the contrary, the record indicates the district

---

[4] The government cites a single case, *United States v. Gerezano-Rosales*, 692 F.3d 393 (5th Cir. 2012), in support of its argument that the district court's tentatively-announced sentence should affect our reasonableness determination. But what the government characterizes as an "initial announcement" of a sentence in *Gerezano-Rosales*, 3rd Br. on Cross-Appeal at 9, was in fact the final sentence imposed by the district court after giving the defendant the opportunity to allocute. *Gerezano-Rosales*, 692 F.3d at 396. Immediately after sentencing the defendant to seventy-one months, the district court attempted to impose a 108-month sentence because the defendant had been "disrespectful when he questioned the appropriateness of the originally imposed" sentence. *Id.* at 400. The appellate court invalidated the higher sentence as substantively unreasonable because "no matter how insolently Gerezano delivered his retorts to the district court, his statements could not have reasonably justified a variance of three years above the guidelines range, especially since the court had previously found that a Guidelines sentence was otherwise appropriate." *Id.* at 402. This case bears little resemblance to Mr. Cookson's, in which the district court announced its inclination to impose a seventy-two-month sentence as a starting point for discussion. *See United States*

28

court, after announcing a tentative sentence, listened carefully to counsel's arguments and Mr. Cookson's allocution.[5] Something about these arguments apparently persuaded the district court to change its mind and impose a more lenient sentence than it had initially anticipated. *See* App. at 283 (explaining the district court "came in . . . not expecting to [impose a probationary sentence]"). But the district court undertook a relatively brief explanation of the statutory factors supporting the sentence it finally imposed, which impedes our review. We therefore do not foreclose the possibility that a more detailed explanation from the district court of the weight it afforded § 3553(a) factors other than § 3553(a)(1) could yield a similar, but substantively reasonable, sentence on remand. *See Park*, 758 F.3d at 202.

## III.  CONCLUSION

For these reasons, we **AFFIRM** the district court's denial of Mr. Cookson's motion to suppress the fruits of the NIT search of his computer. We also **VACATE** the

---

*v. Valdez-Aguirre*, 861 F.3d 1164, 1165 (10th Cir. 2017) (explaining "[f]ederal trial courts frequently approach sentencing with at least some idea of what they intend to impose," and therefore "sometimes announce a sentence before giving the defendant an opportunity to allocute").

[5] Fed. R. Crim. P. 32(i)(4)(A)(ii) requires as much. Had the district court refused to listen to Mr. Cookson's allocution and stubbornly held to its tentative sentence, it may have violated Mr. Cookson's right to allocute. *United States v. Theis*, 853 F.3d 1178, 1182 (10th Cir. 2017) ("A court violates this right to allocute when it definitively announces the defendant's sentence before giving him an opportunity to speak, and fails to communicate to the defendant that it will genuinely reconsider the sentence in light of his remarks.").

district court's decision sentencing Mr. Cookson to five years' probation and **REMAND** for resentencing.